**Electronically Filed
Intermediate Court of Appeals
CAAP-11-0001019
30-OCT-2014
09:10 AM**

NO. CAAP-11-0001019

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

BENJAMIN N. PULAWA, III,
Claimant-Appellant,
v.
OAHU CONSTRUCTION CO., LTD.,
Employer-Appellee,
and
SEABRIGHT INSURANCE COMPANY,
Insurance Carrier-Appellee

APPEAL FROM THE LABOR & INDUSTRIAL RELATIONS APPEALS BOARD
(CASE NO. AB 2009-496 (2-96-12947))

SUMMARY DISPOSITION ORDER
(By: Nakamura, C.J., and Reifurth and Ginoza, JJ.)

Claimant-Appellant Benjamin N. Pulawa, III ("Pulawa") appeals from the November 2, 2011 Decision and Order of the Labor and Industrial Relations Appeals Board ("Board" or "LIRAB").

Pulawa was injured while employed as a construction supervisor by Employer-Appellee, Oahu Construction Company, Ltd. ("Employer"), when, during work-site excavation on August 20, 1996, he was struck in the head by a chunk of hardened cement. *Pulawa v. GTE Hawaiian Tel.*, 112 Hawaiʻi 3, 7-8, 143 P.3d 1205, 1209-10 (2006). By decision dated July 26, 2001, the Director of the Department of Labor and Industrial Relations ("Director") determined that Pulawa sustained a personal injury to his head, and awarded him medical benefits, including concurrent treatment with Dr. Robert Marvit, and temporary total disability ("TTD") benefits.

By decision dated January 5, 2009, the Director denied Pulawa's request for a listening device manufactured by Neuromonics ("Neuromonics device")[1] on the basis that there was no written request from the attending physician. By decision dated March 30, 2009, the Director found that Pulawa's request for a Neuromonics device was barred pursuant to Hawaii Revised Statutes ("HRS") § 386-87(a),[2] awarded Pulawa TTD benefits through December 16, 2008, and awarded Employer credit for weekly benefits paid for the period December 17-30, 2008.

Pulawa appealed to the Board from the Director's March 30, 2009 decision. A hearing before the Board occurred on September 29, 2010. By its Decision and Order, the Board addressed the merits of Pulawa's Neuromonics device-related claim and affirmed the Director's decision denying the request and limiting TTD benefits.

On appeal, Pulawa contends that the Board erred in concluding that (1) the Neuromonics device was not reasonable and appropriate treatment; (2) he lacked certification to be temporarily and totally disabled for the period December 17, 2008 through August 4, 2010; and (3) he was able to resume work.

---

[1]    While Pulawa was being treated at Casa Colina Hospital, a brain injury rehabilitation center in California, Dr. David Patterson, Medical Director at the facility, referred Pulawa to Dr. Lucy Shih, a specialist in Otology and Neurotology, for evaluation of Pulawa's chronic bilateral tinnitus, also known as ringing in the ears. According to Dr. Shih's letter of October 21, 2007, she discussed treatment options with Pulawa and informed him:

> of a relatively new tinnitus treatment which may be beneficial. It utilizes a listening device manufactured by Neuromonics which incorporates a neural stimulus into music to interrupt and desensitize the brain from continued perception of this symptom. I would like to recommend this for Mr. Pulawa, however [I] am currently not aware of a center in Hawaii which provides this service at this time.

[2]    "A decision of the director shall be final and conclusive between the parties, . . . unless within twenty days after a copy has been sent to each party, either party appeals therefrom to the appellate board by filing a written notice of appeal. . . ." HAW. REV. STAT. § 386-87(a) (1993). In so ruling, the Director held that Pulawa's second request was barred by his failure to timely appeal from the January 5, 2009 decision.

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Pulawa's points as follows and affirm:

(1) "Immediately after a work injury sustained by an employee and so long as reasonably needed the employer shall furnish to the employee *all medical care, services, and supplies as the nature of the injury requires*." HAW. REV. STAT. § 386-21(a) (Supp. 2013) (emphasis added). With respect to medical devices, "[w]here it is certified to be necessary by a licensed physician or surgeon chosen by agreement of the employer and the employee, the employer shall furnish such other aids, appliances, apparatus, and supplies as are required to cure or relieve the effects of the injury." HAW. REV. STAT. § 386-22 (1993).

In support of its conclusion of law ("COL") 1 that the Neuromonics device was not "reasonable or necessary medical treatment", the Board's findings of fact ("FOF") 12 and 13 referenced the opinions of Dr. Brian Goodyear, a clinical psychologist who conducted an independent neuropsychological evaluation of Pulawa, who stated that no further neuropsychological diagnostic studies or treatments were required, and Dr. Anthony James Mauro, a neurologist who performed an independent medical examination ("IME") on Pulawa, who stated "that he was not aware that such a [Neuromonics] device was an accepted standard of treatment for tinnitus." The Board further noted in FOF 17 that Dr. Ajit S. Arora, an internist who performed a supplemental IME on Pulawa, agreed with Dr. Mauro's assessment that "the [N]euromonic[s] device would be of questionable value and benefit to Mr. Pulawa for treatment of his tinnitus."

It is not contested that Pulawa's tinnitus condition was related to his work injury. The issue, then, is whether the Board properly concluded that the Neuromonics device did not constitute "reasonably needed" medical supplies. *See* HAW. REV. STAT. § 386-21(a). As to this issue, the Board's conclusion presents a mixed question of fact and law. It appears to be supported by substantial evidence, and is not clearly erroneous

3

in view of the evidence on the whole record. *See Igawa v. Koa House Rest.*, 97 Hawai'i 402, 405-06, 38 P.3d 570, 573-74 (2001).

While the Neuromonics device was recommended by Dr. Shih, her October 21, 2007 letter to Dr. Patterson stated only that the Neuromonics device "*may* be beneficial." (Emphasis added.) Dr. Scott McCaffrey, Pulawa's treating physician, testified that Pulawa needed treatment for tinnitus, but he admitted that he was not familiar with the Neuromonics device and stated that "I don't know where Doctor Marvit got on to this other new technology, I don't know much about it though."[3] Dr. Mauro and Dr. Arora specifically addressed the Neuromonics device in their reports, and both agreed that it would not necessarily be beneficial for treatment of Pulawa's tinnitus. In sum, there were varying opinions among the physicians as to whether a Neuromonics device was "reasonably needed."

Pulawa argues that the Board erred in relying upon the opinions of Dr. Arora and Dr. Mauro because Dr. Arora specialized in internal medicine, toxicology and forensic medicine, and Dr. Mauro specialized in neurology and admitted that he was unaware of the device in Hawai'i and whether it was an acceptable treatment. Pulawa maintains that the only "competent medical advice" presented satisfying HRS § 386-24[4] was the opinion of Dr. Shih, to which Dr. McCaffrey, Dr. Marvit, and Dr. Patterson deferred.

Nothing in HRS chapter 386 suggests that, as a matter of law, a physician must be licensed in a particular sub-specialty in order for his or her opinion to constitute

---

[3] Dr. Marvit preceded Dr. McCaffrey as Pulawa's treating physician. Based upon Dr. Shih's recommendation, Dr. Marvit submitted a formal request for concurrent treatment with House Ear Institute by letter dated December 2, 2008.

[4] HRS § 386-24 provides, in part, that "[t]he director . . . , *on competent medical advice*, shall determine the need for or sufficiency of medical rehabilitation services furnished or to be furnished to the employee and may order any needed change of physician, hospital or rehabilitation facility." HAW. REV. STAT. § 386-24 (1993) (emphasis added).

"competent medical advice."[5] Instead, the definitions of "health care provider" and "physician" provide more general qualifications. HRS § 386-1 defines "health care provider" as "a person qualified by the director to render health care and service and who has a license for the practice of[,]" among other things,"[m]edicine or osteopathy. . . ." HAW. REV. STAT. § 386-1 (Supp. 2013). It further defines a "physician" as "a doctor of medicine, a dentist, a chiropractor, an osteopath, a naturopathic physician, a psychologist, an optometrist, and a podiatrist." *Id.*

Of course, the Board may consider a physician's specialty in determining what weight to give to particular medical advice. This essentially amounts to a credibility determination, on which we defer to the Board as the expert agency. *Moi v. State, Dept. of Public Safety*, 118 Hawai'i 239, 242, 188 P.3d 753, 756 (App. 2008). Here, although Dr. Mauro and Dr. Arora were not specialists in the field of otology or neurotology, they were both physicians as defined in HRS § 386-1, and were certified in neurology and internal medicine, respectively. The Board also relied on the reports of multiple physicians. *See Ramsey v. Cash & Carry Foods, Inc.*, 664 So. 2d 511, 515 (La. Ct. App. 1995) (holding that the sole report relying on the opinion of an unidentified "Physician Advisor," where no basis for the opinion was stated in the report, did not constitute "competent medical evidence" under a Louisiana workers' compensation statute).

Additionally, while Pulawa maintains that Dr. Mauro was simply unaware of the device in Hawai'i and whether it was an acceptable device and treatment, the record suggests otherwise.

---

[5] LIRAB regulations state that "'competent medical advice' *may* include advice from a panel of at least three physicians selected by the director after consultation with organizations such as the Hawai'i Medical Association and convened for the purpose of this subsection." HAW. ADMIN. R. § 12-15-38(b) (1996) (emphasis added). Such a panel was not convened in the instant case, and because the regulation uses the word "may," it does not appear that a panel is required in every instance. *See State v. Kahawai*, 103 Hawai'i 462, 465, 83 P.3d 725, 728 (2004) ("The term 'may' is generally construed to render optional, permissive, or discretionary the provision in which it is embodied[.]" (quoting *State ex. rel. City of Niles v. Bernard*, 372 N.E.2d 339, 341 (1978)) (internal quotation marks omitted)).

Dr. Mauro said that he had reviewed the literature regarding the device and that he had no enthusiasm for the device as a proposed treatment. Under these circumstances, the Board did not err in relying on Dr. Mauro and Dr. Arora's opinions as "competent medical advice."

In reviewing a decision of the Board, this court will "give deference to the LIRAB's assessment of the credibility of witnesses and the weight LIRAB gives to the evidence." *Moi*, 118 Hawai'i at 242, 188 P.3d at 756. Moreover,

> [i]t is well established that courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field.

*Nakamura v.* State, 98 Hawai'i 263, 268, 47 P.3d 730, 735 (2002) (quoting *Igawa*, 97 Hawai'i at 409-10, 38 P.3d at 577-78). Accordingly, we defer on the weight given by the Board to each of the doctor's opinions, and hold that the Board's FOF 20, that the Neuromonics device was not reasonable and necessary, is not against the substantial weight of the evidence.[6]

(2) "Under HRS § 386-31(b) (1993), temporary total disability payments can be terminated in two ways: (1) if the employee is able to resume work, or (2) by order of the director." *Atchley v. Bank of Hawai'i*, 80 Hawai'i 239, 243, 909 P.2d 567, 571 (1996) (citing HAW. REV. STAT. § 386-31(b) (1993)). We address Pulawa's second and third points of error together, as a challenge to the Board's conclusion regarding Pulawa's TTD benefits.

As to the termination of TTD benefits, HRS § 386-31(b) provides, in part, that "[t]he payment of these benefits shall only be terminated upon order of the director or if the employee is able to resume work." HAW. REV. STAT. § 386-31(b) (Supp. 2013). "Able to resume work" means that "an industrially injured

---

[6] *Bocalbos v. Kapiolani Medical Center for Women and Children*, 93 Hawai'i 116, 997 P.2d 42 (App. 2000), cited by Pulawa, is readily distinguishable by the fact that here two physicians affirmatively recommended that the Neuromonics device "*may* be beneficial", and two other experts opined that the Neuromonics device was not necessary. Unlike *Bocalbos,* there is evidence on both sides, and, therefore, the Board could reasonably conclude that the requested Neuromonics device was not reasonable and necessary.

worker's injury has stabilized after a period of recovery and the worker is capable of performing work in an occupation for which the worker has received previous training or for which the worker has demonstrated aptitude."  HAW. REV. STAT. § 386-1 (Supp. 2013).  In this case, more than twelve years after the underlying accident, the Director concluded that Pulawa was "capable of resuming some form of full-time work" and the Board found that Pulawa's condition was "medically stable" and that he was "capable of working."

      1.    The Board's determination that Pulawa was medically stable was not clearly erroneous.

Pulawa first challenges the Board's finding that he was medically stable.  He initially argues that the Board erred in FOF 10, 11, and 21, when it found that Pulawa did not provide physician certifications to support an award of temporary total disability.  Pulawa contends that the Board treated "certification of disability" or "medical certification" as terms of art, despite the fact those terms are not defined by the statute, and that the evidence he provided was sufficient for purposes of an award of temporary total disability benefits.

Although the Board used the terms "certification of disability" and "medical certifications", taken in the context of its findings, it does not appear that those terms were used as terms of art.  Instead, the Board appears to have found that the information provided by Dr. Marvit and Dr. McCaffrey did not amount to persuasive evidence demonstrating that Pulawa was entitled to an award of temporary total disability.  The Board did not indicate that the reports failed to comply with any statute or regulations, and the reports appeared to comply with Hawaiʻi Administrative Rules § 12-15-80(a)(3)(E), which states that an interim WC-2 report shall include "[d]ates of disability, work restrictions, if any, and return to work date."  HAW. ADMIN. R. § 12-15-80 (2004).  Pursuant to HRS § 386-31(b)(1), the Director's decision is "based upon a review of medical records and reports".  HAW. REV. STAT. § 386-31(b)(1).  Therefore, the Board was not adding an additional requirement by using the terms

"certification of disability" or "medical certification", but rather was commenting on the sufficiency of the medical report evidence as to the stability of Pulawa's medical condition.

Pulawa next contends that the Board erred in concluding that he was medically stable, at FOF 22 and COL 2. In support of this contention, Pulawa points to the trial testimony that he was undergoing treatment for headaches, tinnitus, and depression on an ongoing basis. Pulawa also refers to the July 21, 2010 IME report by Dr. Arora which stated that "ongoing treatment would be necessary during the foreseeable future" for Pulawa's depression, acknowledged that Pulawa was suffering from ongoing "intractable" headaches, and recommended a consultation with a Dr. Raskin in California. Finally, Pulawa notes that in his May 30, 2008 report, Dr. Goodyear stated that "I do continue to believe that it would be reasonable and appropriate to have [Pulawa] evaluated by a neurologist who is experienced in the area of traumatic brain injury in order to optimize future medical care to address the issue of maximum medical improvement."

On the other hand, as to the stabilization of Pulawa's medical condition, Dr. Goodyear's report stated that Pulawa's condition had been "stable and ratable" since the time of his December 1999 evaluation, and that Pulawa was capable of returning to some type of productive employment if he were motivated to do so. Dr. Mauro's report similarly concluded that Pulawa's condition was medically stable and ratable. Dr. Arora's report indicated that Pulawa "could be involved in some type of employment with his limitations." The Board credited these opinions in its finding that Pulawa's condition was medically stable. Accordingly, there was substantial evidence on the record supporting Pulawa's medical stability, and the Board's finding and conclusion on this issue were not clearly erroneous. See In re Water Use Permit Applications, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000) ("An FOF or a mixed determination of law and fact is clearly erroneous when . . . the record lacks substantial evidence to support the finding or determination.").

2.    The Board did not err in finding that Pulawa was capable of working.

Pulawa contends that the Board erred in its FOF 22 that Pulawa was capable of working.  Pulawa argues that the Board improperly used the term "capable of working" in its findings, rather than the term "able to resume work" as defined in HRS § 386-1 (Supp. 2013).  The Board's use of the phrase "capable of working" notwithstanding, the employer here sought termination due to Pulawa's alleged ability to resume work.  Therefore we consider whether sufficient evidence supports the implicit finding that Pulawa was able to resume work.

We conclude that sufficient evidence was presented to support a finding that Pulawa was able to resume work.  Dr. Goodyear, for instance, indicated that while Pulawa would have difficulty returning to his previous position, he was capable of returning to some type of productive employment if he were motivated to do so.  Dr. Mauro similarly opined that while Pulawa was not suited for work as a construction supervisor, he was capable of "gainful employment in a position commensurate with his current cognition and personality."  Further, Dr. Arora stated that Pulawa's symptoms should not restrict him from gainful employment.  The reports of Dr. Goodyear, Dr. Mauro, and Dr. Arora constitute reliable, probative, and substantial evidence that Pulawa was capable of performing work "in an occupation for which [he] has received previous training or for which [he] has demonstrated aptitude," and therefore support the implicit finding that Pulawa was able to resume work.

Pulawa contends that the Board erroneously relied on the report of Priscilla Ballesteros Havre ("Havre") for the proposition that Pulawa would not be a feasible candidate for vocational rehabilitation.  However, Havre's opinion was not material to the Board's finding that Pulawa was able to resume work.  Having determined that the Board did not err in finding that Pulawa was medically stable and able to resume work, we hold that the Board properly concluded, pursuant to HRS § 386-31(b), that Pulawa's TTD benefits could be terminated.

9

Therefore,

The November 2, 2011 Decision and Order of the Labor and Industrial Relations Appeals Board is affirmed.

DATED:  Honolulu, Hawai‘i, October 30, 2014.

On the briefs:

Dan S. Ikehara,
for Claimant-Appellant.

Brian G.S. Choy and
Keith M. Yonamine
(Choy & Tashima)
for Employer-Appellee and
Insurance Carrier-Appellee.

Chief Judge

Associate Judge

Associate Judge

10